We hear counsel now in the United States v. Anthony Allen and Anthony Conte. Mr. Schachter, while you're getting ready, let me make a preliminary statement, which is actually relevant to both sides, and the government will be able to comment on this one when they address the court. Both sides will have the time necessary for their arguments. We've given you more than usual, and you're lucky that there's nothing else this morning. I assure you, you will have time necessary for your arguments. That said, I have some threshold, possibly non-record inquiries, by which I mean that I, speaking for myself only, would welcome your description of the human and prosecutorial context here. The general public, as well as the court, are entitled to understand how and why this prosecution was undertaken, or any prosecution was undertaken. And this is an unusual and complicated case where the two defendants are U.K. nationals, they are young and relatively low-level employees, and they worked in London for a Dutch bank, which may be a household name in Den Haag, but not in my parochial American world. The case is also brought by so-called main justice, not by a prosecutorial office that certainly regards itself as second to none in securities and financial prosecutions. Now all of this is a puzzlement to me, and interesting at least, so maybe you can give us a description of what was going on here in a way that's comprehensible to non-specialists. Well, I know you're geared up with large questions of statutory construction and constitutional issues, all of which we will hear, but we want to get a little context here. May it please the courts, this is a topic which I am very pleased to begin with. And the answer to Your Honor's question is, I have not the slightest idea. When I was informed that the Justice Department intended to indict my client, I went to them and said, in God's name, would the Justice Department need to prosecute these British citizens for conduct which occurred exclusively in London, where the cooperating witnesses are not US citizens, where it is all about the alleged involvement of, or it's responding to questions that are posed by a British banking trade organization about a rate which is set at 11 o'clock London time. Why is it necessary to drag this British citizen to stand trial here, thousands of miles from home, from his family, he has young children, it was a burden for his parents who are elderly and came to stay in New York for the length of this trial, and to what end, so that we can incarcerate this British citizen, thousands of miles from home, where it would be a great burden for their family to visit them. I said, why? Now there may be a circumstance. I don't want you to lose track of Judge Cabrera's question, but were there prosecutions in Britain? Absolutely, and what I said to the Justice Department was, there may be circumstances where no other government is addressing this harm, and it is a global harm, where the United States Justice Department feels that they need to step in. But I noted that there were extremely active British prosecutions, there were investigations being undertaken of exactly the same conduct in London, in fact there were active investigations of our clients. The Financial Conduct Authority, their version of the Securities and Exchange Commission, as is an issue which is created by what the government did in this circumstance, they had an investigation that was active, they knew they had an active investigation, they were working very closely with the serious fraud office in the UK. What is the possible reason why it was necessary for the United States to spend taxpayer resources to prosecute this British citizen and incarcerate him here in the United States? Are you aware of other LIBOR-related prosecutions brought in the United States? Subsequent to ours, ours was the first, and then subsequent to that there have been other charges and there are cases pending. There are other cases in the UK which have been prosecuted, some successfully, some unsuccessfully. Where are they pending in the United States? Do you know? They are brought by the fraud section, I believe that they were all, I'm not positive, but I believe they were all filed in the Southern District of New York, but all being prosecuted by Maine Justice. With no involvement from the Southern District of New York. There were days when U.S. attorneys for the Southern District of New York threatened to resign over things like that. I understand that. But it isn't, after all, the Southern District, it is a branch of the Justice Department in its own little way. As a technical, as a very technical matter, I know some former U.S. attorneys that would maybe disagree with that statement. But no, it was very troubling. And in fact, one of the central issues in our case is that there is a critical witness, the LIBOR secretary from the British Bankers Association, John Ewan. He absolutely would have been available to us to have him testify if Mr. Allen and Mr. Conte were prosecuted in the United Kingdom. And in fact, when he testified, in some circumstances, there have been acquittals that, according to the news reports, this is all outside the record, but according to the news reports, it is largely based on his testimony. Because his testimony, which we quote from his testimony in the UK, is that in the British Bankers Association's view, you commit no falsehood if you submit a LIBOR rate which is anywhere within the range of reasonable estimates of a bank's borrowing costs, whether it's the highest or the lowest. We think that if the jury here had the opportunity to hear Mr. Ewan's testimony, that that would have been a basis for them to acquit. We think they certainly would have acquitted. You would have had the entity which set up this construct, which says, this is okay with us. We don't consider it to be a falsehood as long as it is a reasonable estimate of a bank's borrowing costs. Have there been any convictions in Britain? Yes. So in spite of his testimony, there have been convictions? Well, the evidence with respect to some of these, with respect to certain people, is mixed. So, for example, the first conviction and the most well-known in the UK is that of a man named Thomas Hayes. Mr. Hayes was bribing brokers through wash sales in order to get them to spread false information, in order to recommend that traders submit false information to the British Bankers Association. And that's a horse of a different color. It wasn't within the reasonable rates, is what you're saying. Correct. And that's when it becomes false and fraudulent. On the record that we have, as opposed to the one that we might have had if Mr. Ewan had been allowed to testify, is there not plentiful evidence, including from one of your experts, that what the purpose of LIBOR was was to decide, to set a benchmark for what is the best borrowing rate for the best customers? Well, I think it is, aside from the word best, the purpose is to get banks to submit their reasonable estimates of where they can borrow. If I'm asked what's the best rate at which, someone says to me, you have a good credit rating, I'd like to know, for my purposes, what a person with a good credit rating could borrow at. And I know from experience that my bank would give me a loan at 5%. I also know that the loan shark operating out of the bar on the corner would be happy to lend me money at 25% for two weeks. I also know that there are other lending agencies that might charge 6 or 7. I'm entitled to say 12 because that's somewhere in the range. I mean, that would be a truthful answer to that question. I don't know that it would be. That's not our facts. Well, I don't know that isn't your facts. Your facts are that an agency that's trying to set a benchmark, and I understand that I have problems with the exclusion of you and Test Drive because that could problematize this, but on the record that we've got, they're asked for an honest estimate. They're not asked, pick a number in a range. They're not asked, the literal question that's asked is certainly not, give us a number that falls somewhere in the ballpark of what you might be able to borrow at. They're asked, what's your estimate? What's the number at which you could borrow? And there's evidence that your clients calculated such a number and then were responsive to somebody who said, you know, it would be good for us to submit a different number than that. Now, I don't understand why, I mean, again, we're not talking now at the moment about the evidentiary issues, but as a matter of what is false and fraudulent, is there not plentiful evidence from which a reasonable jury could conclude that they were asked, what is their estimate, and they did not give their estimate, they gave something else that was not their honest answer to that question. Tell me what's wrong with that as a theoretical matter of what's a crime under the Wireford statute. I'll answer it two ways. First, there was not evidence that that occurred. Rather, I think it's important to discuss a little bit the construct here. The question, at what rate could you borrow, this is the question posed by the BBA, at what rate could you borrow funds for you to do so by asking for and then accepting interbank offers in reasonable market size just prior to 11 o'clock? The question was posed for 11, I'm sorry, 15 different time periods from overnight to 12 months. It is undisputed that banks did not borrow for a vast majority of those purposes. There was no interbank borrowing. It was undisputed that this is a subjective estimate and not more than that. It is not transaction-based. Nobody is required to look at the transactions. But they're asked for their subjective estimate. It's not a case where they're asked, what is the scientific fact, and alas, there is no such thing, so there can't be a falsehood. They're asked for their estimate. And the question is, did they give their honest estimate or did they give a falsehood that was convenient to them rather than their best guess? And if you ask me, what's your estimate of how many points the Patriots are going to score in the Super Bowl? Judge, why don't we let him answer the question as opposed to going into compound paragraphs? There is no evidence that the estimates were not honest in that they were accurate. There is no evidence that either appellant believed that they were submitting a rate which they did not believe to be an accurate answer, a fair and reasonable estimate. There is no evidence that supports that. And, in fact, the evidence was that there was, in effect, part of the government's summation, that there was a range of accurate estimates. Are they asked for a fair estimate or are they asked for their opinion? The question that Your Honor poses suggests that there is only one answer to the question and the evidence was to the contrary. And, in fact, the government's cooperating witness, Mr. Yagami, his testimony is at page 265 of the joint appendix, he testifies. There is no one correct number. Mr. Robson, at the beginning of his direct testimony, is asked by the prosecutor to basically to describe the scheme. And he says, and I'm quoting, and this is page 225 of the appendix, so there would be kind of a range of two or three numbers where LIBOR could possibly be. The question, by the way, is first explain again what you did. That's the question posed by the prosecutor. So here is Mr. Robson, the principal cooperating witness's opportunity to explain the scheme. And he says, so what I would do is I would ask the interbank broker where he felt the LIBORs would be. There would be kind of a range of two or three numbers where LIBOR could possibly be. This is quoted at page 19 of our brief. So, for example, if the break. This is the government witness. Government witness direct examination at the outset of Mr. Robson's testimony. He says there would be kind of a range of two or three numbers where LIBOR could possibly be. So, for example, if the broker came on and said three months, I think I'm hearing might be 80, might be 85, might be 90, but probably 75. He says I would go down the middle. And then the government asks. Now, let's say you, in fact, had a trader request where a trader wanted you to submit a LIBOR to favor their position. So what would you do? Answer. So, given those circumstances, if one of the traders had contacted me and said three months, if I needed a higher three months, I would have moved it higher at his request. I would have moved it towards the 90 level or set 90. So, in other words. He's moving. He's moving his estimate. He is submitting. He is selecting. He selected an estimate, and then he moved that estimate. He got a range. No question. He got a range of information. He took that information into account. He said, well, best I can do is to average it. And then somebody says, don't average it. Give the high end of the range because that's what we want. And then he, in his words, bumps. Right. He moves the estimate. He selects in the range of accurate estimates that he could provide.  I mean, there are lots of things that one could be asked to estimate, and it wouldn't be wrong. You can't say, if I, if I say, oh, the picture's going to score 40 points in the suit, but I can't say that's wrong. Who knows? But if I'm asked, what's your estimate? And I pick one. And then somebody else says, wait a minute. Tell him something else because that's better for you because you've got a number in a pool or something. That's a lie. If I say my estimate is 40 points, when my estimate is really 28. Well, respectfully, I disagree. And here's the, here's why. If you're asked for an estimate, and there may, there, an estimate is inherent in generally in estimates. And it certainly is the evidence in this case that there was no one right answer. You could choose three. Assume you could choose three answers. You could choose 75, 80, 85. They're all the same. They are all equally accurate. And you select one accurate answer as opposed to another accurate answer because it will help your employer, which is, as an employee, what you have a fiduciary obligation to do. If you simply are selecting one accurate answer as opposed to another accurate answer, that is not wire fraud. No, an answer that's accurate in the sense you're saying is, if I honestly thought this, no one could quarrel with me. But I'm asked for what I honestly think. And if I don't give the answer that I honestly think, I mean, that's standard that that's a fraud. 100%, I agree. There was no evidence of that. Had the government presented any evidence that the, that the appellants disbelieved the opinion that they were providing. And the statement of opinion in answering the BBA's query is, I believe that Robobank can borrow at 3.10% for six months. That's my estimate. That's what I believe. Had the government presented any evidence that, that the appellants, in fact, didn't believe. They thought, no way 3.0. In fact, three or four. If there had been evidence of that, then I would agree with Your Honor. However, there was no evidence that that's, that's our argument. That's our point. There was no evidence that they disbelieved. And in fact, in the way the offense was described to the jury by both the prosecutors and, and, and Judge Rakoff, the jury wasn't asked to determine that. They were only asked, they weren't asked to determine falsehood. I would just like, if I may, just a quote from the prosecutor's summation. If you find that the defendants took part in the scheme to base Robobank's LIBOR submissions, at least in part, on trading positions, you should convict. Regardless of whether the submission was inside or outside of some so-called range, you should convict. It's quoted at page 339 of our appendix. So the government is telling the jury, look, all you need to find is that one of the considerations in their mind when they selected a perhaps accurate estimate was what would benefit their employer. If they did it, that's wire fraud. And that's not the law. If they submitted a bid that was outside the range of numbers that they had accumulated from talking to their brokers, would that, on the basis of a request from a trader, would that be fraud? That very well may be, because then the circumstance would be that there would be evidence that the defendant disbelieved the opinion that he was providing. And there was no such evidence in this trial? There was no such evidence. And even more importantly, the jury wasn't asked to consider that, because they were told that the wire fraud offense here was submitting a rate which may be within the range. It may be believed by the defendant to be an honest answer, an accurate estimate. But if they took into account what would benefit their employer, then they were told that's the crime that they are charged with. The government, Judge Rakoff, over our vigorous objection, that's how Judge Rakoff described the offense to the jury, which we believe is a constructive amendment, because that's not in the indictment. That is not the theory that's articulated in the indictment. The indictment articulates a fraud theory. They say that they chose a rate that was not what they perceived to be what Robobank could borrow money at. That would be fraud. Could you elaborate on what Mr. Ewan would have testified? Can you give me, like, two or three of the best quotes for what he would have said about what the question meant? Quoted at page 691. If you'll permit me, Judge, maybe he can, as a threshold to your question, which he should, of course, answer. Tell us what exactly happened as to his testimony. Who wanted what and why was he not permitted? He was not permitted because the court ruled that his testimony was not relevant. Here's what happened. Answer the judge. I can lay out the timeline. Okay. At Mr. Allen's arraignment on March 20th of 2015, we alerted the district court that we anticipated to move for Rule 15 depositions. We thought that was going to be a real possibility, given the fact that all of the witnesses and all of the conduct occurred outside of the United States. On April 21st, 2015, so just one month after the defendant's arraignment, we reminded Judge Rakoff that we believed that we would need to move for Rule 15 depositions, but it's a difficult position to necessarily identify what you're effectively doing is identifying trial witnesses one month into the case, and we needed time to review the hundreds of thousands of documents which were going to be provided to us in discovery. In June of 2015, Mr. Ewan testified in the United Kingdom, and then two weeks later, the Justice Department filed a superseding indictment. That's June 25th. We received documents from the government relating to the British Bankers Association and Mr. Ewan on June the 26th, and within a matter of weeks after that, so that's June 26th, on July 14th, we told the court that we intended to request Mr. Ewan's deposition, and the district court ordered us to file our motions by July 24th. We filed our motions on July 24th, and Judge Rakoff denied the motion on August the 18th. We thought this was a critical witness, and one of the reasons was his testimony, and I'm quoting, and this is page 691 of the joint appendix. This was his sworn testimony in the United Kingdom. A panelist who can borrow in reasonable market size at any one of a wide range of offered rates commits no falsehood if she bases her response to the daily LIBOR survey upon the lowest of these, or the highest, or any arbitrary selection from among them. If Mr. Ewan and Mr. Conte were prosecuted in the United Kingdom, the jury would have heard that testimony, but because Main Justice decided to prosecute them here in the United States, the jury never heard that testimony. We think that that would have made a significant difference. The government decided to prosecute because even though they could pick a number within the reasonable range, they were influenced by the request from traders to pick a certain number. I'd like it high on the three-month rate, and that is the nature. That's the intent part of the fraud, correct? Correct. And so why isn't it a complete fraudulent act? Because, well, several issues. This court in the countrywide decision made very clear that bad faith or impure thoughts does not give rise to fraud. You need a false representation or a misleading half-truth or an omission, and it was conceded below that this case was not based on omissions. You need the actus reus, not simply the state of mind. Your argument is they had impure thoughts, but there was no fraudulent act. Is that your argument? Well, I guess I would put it somewhat differently. Certainly there was no impure act, but I would even quarrel to some extent with the impure thoughts. The thought that they had was that this will benefit their employer. Look, this was extremely – these prosecutions we detailed, this is at sentencing, but there are more than 125 people that were engaged in identical conduct. In fact, the Bank of England called Barclays and told them that they should put their LIBOR submission low because they were worried about the general economy. So what the thoughts were of these people were they're an employee and they're helping their employer. I think that the thought process was something along the lines of as long as I'm answering the question accurately, in other words, I'm providing, there is no one answer. During the financial crisis, there is no interbank – that's most of our relevant time period is the financial crisis. There is no interbank borrowing at all. Banks do not borrow from one another, and yet they are called upon to submit a LIBOR rate, which is what rate can you borrow? It is a very wide range. Back to Mr. Ewan. Mr. Ewan's testimony, it seems to me, goes directly to the question, what is it that they are being asked, right? I mean, the testimony in the record on that from the government's expert witness at least is somewhat to the contrary in terms of what he thinks they were supposed to do, which is, as I was trying to suggest, to give their best estimate, not to pick a number in a range. But Mr. Ewan seems to say the opposite, and he was unwilling to come to the United States to give that testimony. That is certainly correct. And you ask to do what you do when a witness is unavailable, which is to do a Rule 15 deposition, and the government opposed and the judge didn't let you do it. That's absolutely correct. And with all due respect to this business school professor from California that the Justice Department flew in to testify, his knowledge of how to interpret the BBA's question is no greater than any of ours. There is no book of rules from the British Bankers Association. There doesn't need to be a book of rules necessarily. There's a reasonable way of interpreting this question based on what the purpose of this is, and the jury had certain information from an expert that goes to that. But at least you've got this. Whether or not you're right about the argument that there is no possibility of a crime here, you've also got the argument that the jury was not permitted to hear all of the evidence that bears on the question of how the question should be interpreted. That is absolutely correct. And even Mr. Harris, the government's expert, testified that this is an estimate, it's subjective, and during most of these time periods there is no interbank borrowing whatsoever from which these traders are to draw on to come up with a number to submit each day. Do we know from the record or do we care why Mr. Ewan couldn't come to testify? Does it matter? Maybe he just didn't want to get on a plane, which is fine, but I'm just wondering whether there's something in the record that we should know. I don't think so. What was your argument in behalf of the Rule 15 deposition? Which was denied? Well, it was... He doesn't want to come? He's available in London? We were informed by his counsel that he would not come, so the only way to have this testimony presented before the jury is to take his Rule 15 deposition. I don't want to stay out of the United States if you're anywhere near LIBOR with these folks. I think that's true. Or he might just not want to get on an airplane. So what's the theory of denial, if you can refresh our recollection, about why would Judge... I know that in fast-moving prosecutions or hearings, and all hearings before Judge Rakoff are fast-moving, what would be... What's the reason for denying? Do we know what the reason is for denying the Rule 15? Seems like a simple enough motion. I think I have trouble articulating the basis for why his testimony would not meet the relevant standard. I think for a Rule 15 deposition it has to be highly relevant, not just simply 401, but nonetheless. I have trouble articulating the Court's decision. He said it wasn't relevant to whether a fraud had occurred. Did the government object? The government certainly did object. I was surprised that the government objected to a request to take testimony and have it presented to the jury of what seems to be a central witness, particularly when one of the government's theory is that the defendants were acting dishonestly and not following the British Bankers Association's expectations. How could... And, in fact, that's much of the government's summation. The government talks about that. How could then the witness from the British Bankers Association that runs LIBOR, how could that testimony be denied to this jury? I... Yes, the government objected. We'll hear from them on that, for sure. And they'll want to be thinking about it. But before you sit down, would you briefly address the Castigar issue? Yes. So what we had, again, by virtue of the fact that these men were prosecuting the United States, is an extremely unusual circumstance. We are aware of one case where it has ever happened that a witness, a government witness has been exposed to a defendant's compelled testimony. Really, it never, this never happens, never should happen. Somebody testifies on national television under an immunity granted by Congress. Exactly. It's an extremely, it's an extremely rare circumstance. Which has happened, and that's the case you're referring to, I take it. Of course, yes, Your Honor, yes. Poindexter and North, right? Yes, yes. Unusual. It's very unusual. Here you have a circumstance where, and I was present, by the way, at Mr. Allen's U.K. testimony, and I said, I just want to make perfectly clear that this man has Fifth Amendment rights in the United States, and so if, God forbid, he's ever prosecuted in the United States, that no use or derivative use can be made of this testimony. There can be no, any exposure by anyone associated with this prosecution, any witness, would effectively make him unprosecutable here in the United States. I just want to make that clear. And here you had a circumstance where the government's main cooperating witness, Paul Robson, he testifies one way before the Financial Conduct Authority. He testifies effectively. They didn't think he was doing anything wrong. During that proceeding in Britain, was there anybody from the United States government present? No, although they were well aware of the testimony, I believe, because I believe that I had notified the Justice Department of the testimony, and I believe that they speak in their papers of their efforts to wall themselves off from the testimony so that the prosecutors themselves did not hear of the testimony, even though they were speaking to the SFO, I understand, on a pretty regular basis because they were coordinating the investigation, who was going to prosecute who. There's interaction between the Justice Department and the SFO, but they walled themselves off from that. I interrupted you. Go ahead. So Mr. Robson testifies one way before the FSA. Then it was called the FSA, now the FCA. And then he receives Mr. Allen's compelled testimony, which he's forced to testify under a penalty of imprisonment in the U.K. He reads that testimony, and he has obviously read it carefully. We attach his markup of the testimony in the appendix. He circles, he stars throughout the testimony, and it's not surprising that he would pay attention because Mr. Allen was Mr. Robson's supervisor. So this is pretty important testimony. And, in fact, Mr. Robson had testified that he thought he was supposed to be speaking to traders in other countries so that he could estimate borrowing costs. And Mr. Allen says no, they really shouldn't. When he reads that testimony before the FCA, he says no, he shouldn't be looking to other traders in order to set LIBOR. And he stars, and he circles, and he asterisks. And then he writes five pages of notes to his attorney about what he read in Mr. Allen's testimony and also Mr. Conte, who he sits next to. And, remember, the subject of this testimony is about things that happened years ago, and these are close co-workers of Mr. Robson. So, of course, he pays close attention to the compelled testimony. And then he tells a completely different story. We detail certain portions of that in our brief. He tells a completely different story. Now, the government has what the courts have referred to as an extremely heavy burden. And the reason why it's a heavy burden is they have to prove a negative. They have to prove that he, that the government, that there was no use made, that he made no use whatsoever. He was not affected. His recollection was not refreshed. It is, according to the D.C. Circuit, it doesn't even matter if that witness had personal knowledge of these events because you still don't know what can affect somebody's. The D.C. Circuit, it didn't even matter that the witness had given, in substantive terms, the same testimony to a grand jury before being exposed to Mr. Norreth's testimony. And the normal way that this would be done, that the government tries to meet this burden in these cases, is to look back at, if they are fortunate enough to have such a thing or they took the trouble to have to make it, at exactly what you're doing. Look at Robson's testimony before he was exposed to the immunized testimony. Compare it with after and demonstrate that it's the same thing. But here you're telling us it is, in significant ways, not the same thing. The canned testimony is completely, what the D.C. Circuit referred to as the canned testimony, which you could look to to show, theoretically, that the witness was not in any way affected by his review of this testimony. And the D.C. Circuit says memory is a very difficult thing. When you're asking witnesses to talk about their memories, what can affect the memory of things that happened years ago? It's hard. But if you had, the D.C. Circuit theorized, if you had canned testimony and you're able to show the testimony is identical to the testimony they provided from before exposure to after, then perhaps you could show that this witness was not affected in any way. Judge Rakoff, in addressing the Castigar issue that we raised, explicitly stated that he's not following the D.C. Circuit's standard and makes no analysis of what the D.C. Circuit said was the test, that Mr. Robson was not in any way, not in any way, and these are their words, shaped, altered, or affected, that the government must prove, they must negate the possibility that his testimony was refreshed or influenced. And that is a heavy burden. And it is a burden that Judge Rakoff released the government from, in this circumstance, that that's not the test that he's going to apply, and we believe that that was, that was his. This is a rare circumstance, as you say, and the D.C. Circuit is not us, and we've never confronted this situation before. Am I right that what Judge Rakoff essentially did was apply a test that's almost like what happens to eyewitnesses in a suggestive identification test situation, which is to say, since Mr. Robson says he had a good opportunity to learn this information on his own, since he was there, presumably, for most of the things, anyway, he's testifying about, and I credit that he says this is his real recollection now, and it's not really influenced, that's enough? That's basically what he did? That is basically, I will add one caveat, there's one additional thing that we suggest is irrelevant that he also looked at, but that's effectively, he credited Mr. Robson's denials, and I'll note that that is an issue that this Court has confronted, because in many circumstances, the question is whether prosecutors have been exposed. And this Court has said on numerous occasions that we're not going to rely on a prosecutor, but if an officer of the courts denials as to exposure, the government needs to prove more than that, and we suggest, we argue that certainly if the prosecutor denials. Get away from it. What is the extra thing that I didn't mention? Sure. So Judge Rakoff, the government also assembled a chart, which compared Mr. Robson's testimony to other evidence that was presented to the jury. So in other words, Mr. Robson says this, but so does Mr. Yagami. Mr. Robson says this, but so does Mr. Stewart. But they didn't print a chart of his before and after testimony, did they? Absolutely not, because that would actually address the issue, which is was Mr. Robson's testimony in any way shaped, altered, or affected? The fact that Mr. Yagami testified at trial, something that's consistent with Mr. Robson, well, that's not the basis for Mr. Robson's testimony. He certainly didn't review Mr. Yagami's trial testimony before testifying at trial. There's one other issue you've got to get over right on the Castigar issue, which is assume hypothetically that we agreed with you that if the SEC or the U.S. Justice Department had given Mr. Robson this transcript and then Mr. Robson testified, assume that we agree that that would be a flagrant violation of Castigar. How is it changed or is it changed by the fact that the testimony was compelled by a foreign government and under the foreign government's rules they could, if they had done this prosecution, they could have done essentially what the government did here. I take it that's the belief without consequence. Yes. That's, I believe, simply wrong. And the reason for that, first of all, I will note that taken to it logically then, the government would say, well, sure, Mr. Allen was compelled under penalty of imprisonment in the U.K. to testify, but we didn't do it. So there is no Fifth Amendment doesn't apply. Nothing would prevent them from using it any way they see fit. In fact, they could introduce it, according to the government's theory, they could introduce it to the jury. Sure, let's have Mr. Allen's compelled testimony presented before the jury under their arguments. There might be some due process limits on this, right? There could be, for example, if it was compelled by torture, the case might be different. Or if it was a more flagrant use of the testimony, that might be different. But does every jot and tittle of Fifth Amendment law apply in the circumstance where a foreign government has done something that could compromise American prosecutions if they're just doing what they do under their law? They give this witness the testimony to look at because there's no problem for them to do that. And now it's happened. And now an important witness is just unavailable to the United States? Well, it's difficult to address circumstances beyond this one. But here we have the Fifth Amendment. And the Fifth Amendment prohibits the – the reason why the Fifth Amendment applies here is the act which violates the Fifth Amendment is the use of the compelled testimony. It's not the compulsion. Supreme Court has made that clear. It is the use of the compelled testimony. That is when the violation has occurred. It doesn't matter. Which is the Fourth Amendment cases. That's correct. That's correct. But under the Fifth Amendment, it is the use of the compelled testimony in any way, direct, derivative, that is the Fifth Amendment violation. It doesn't matter who did the compelling because that is not the threshold issue. No court has suggested that the Fifth Amendment does not apply to taking compelled testimony of a witness who was subsequently prosecuted in the United States. And, in fact, the Supreme Court in Bram, United States versus Bram, they dealt with this exact circumstance. This was a testimony that was taken in Canada of someone who then is prosecuted in the United States and the Supreme Court, a long time ago, it's late 1800s, 1898, I believe. They were remarkably liberal, the Supreme Court, in the late 19th century. But just as authoritative. And they said – Did the Warren Court look – The case has not fallen into destitute. That's correct. That's correct. And many courts, including this court, some directly, have said that it's well settled. In in-ray terrorist bombings, this court said, foreign nationals interrogated overseas but tried in the civilian courts of the United States are protected by the Fifth Amendment. In Youssef, this court said, the law is settled. The statements taken by foreign police in the absence of Miranda warnings are admissible if voluntary. The Ninth Circuit in Brule addressed this case, this circumstance, head on because it was statements that had been compelled by Mexican law enforcement. And the Ninth Circuit says the Fifth Amendment applies. There is no case which has ever held that the Fifth Amendment does not apply to the Justice Department's use of compelled testimony because the compelling was outside of the United States. And unlike the Fourth Amendment, this is not a restriction on government action. It's not a restriction on government. It's not like Miranda. It's not a prophylactic rule. The rule is against the use of the testimony regardless. It doesn't ask anyone to find fault in the compulsion. It's not a question of whether or not the Justice Department is to blame for this testimony. The issue is are they using it. Thank you, Mr. Shea. Thank you. Alexei, looking forward to hearing from you. You might give some thought to the original inquiry by me at the threshold regarding the history and timeline of the prosecution itself. May it please the Court. John Pelletieri from the Department of Justice on behalf of the United States. Turning to that first, Judge Cabranes, LIBOR was devised by the British Bankers Association to be an impartial market tool for use in financial transactions throughout the world. And it was and is used in financial transactions throughout the world, including many in the United States and in New York. Now, the defendants here also manipulated the U.S. dollar LIBOR. And, in fact, they did it with individuals located in New York in a bank branch located in New York. And the main justice, as a general matter, has been investigating and prosecuting the LIBOR cases and has been handling those and taking the lead on that. So that's generally the background here. Are there other cases pending on LIBOR? There are other prosecutions pending, yes. Is this in the Southern District? I believe in the Southern District. I'm not positive off the top of my head, Your Honor. But this is the first? This is the first to go to a jury and lead to a conviction. But there have been deferred prosecution agreements with the banks, a number of them. And so those prosecutions have been resolved with main justice with the banks themselves. And this was the only one to go to trial so far and to lead to a jury verdict against individuals. The banks who submitted bids, are those the banks you're talking about? So you've had deferred prosecutions with other banks? Other banks, Your Honor. Rabobank, for one, entered into a deferred prosecution agreement, and other banks as well. So you have a deferred prosecution with Rabobank, and yet you're pursuing these two employees of Rabobank. Well, they admitted liability. They admitted guilt, and there's a deferred prosecution agreement, yes. And we also went into and also prosecuted individuals as well. Now, turning back to the purpose of LIBOR and its function, as I mentioned, the British Bankers Association intended it to be an impartial market tool, and for that reason they selected a panel of banks based on the reputation, the scale of activity, and the perceived expertise of those banks. And then they requested, they required that those banks provide an estimate of the banks' borrowing costs on the interbank market every day around 11 a.m. London time. Now, Rabobank required the defendants here, who were cash traders, to provide that estimate because they had the expertise. And so they were able to evaluate, and Mr. Allen's testimony at trial went into this. He described, this is at 1165 to 1169 in the trial transcript, how he was able to evaluate market information every day. He had the expertise as a cash trader, evaluate market information, and get a picture of the market, get a picture of where cash was trading. And as time went on, that picture narrowed down to a single number that he could provide. A single number or a range of numbers? No, he said it was a straightforward process, and I could provide an estimate every day of what the banks' borrowing costs were. He didn't mention a range or say I couldn't figure out between a one of a number. His testimony was that I had the expertise and I could do it, and I did do it. And he said, yes, I received requests from traders. They asked me. It was, number one, improper for them to even ask me, but I just didn't act on those. I kind of pushed them off, and I gave my honest estimate every day. That was his testimony. The jury was entitled to reject that testimony. And, in fact, the jury on that testimony alone could have convicted Mr. Allen, but there was ample evidence supporting that there was a single number, an estimate that the defendants were able to come to every day, and that instead of providing that estimate, they provided something different. They bumped the number. They biased the number and provided that biased number with the purpose of benefiting robobank traders, the positions they held in interest rate swaps. Now, these interest rate swaps. I may tend to agree with you about that, what the jury could have found on the evidence in the record, but it seems to me there is some possibility that the question is ambiguous, that it could be read the way Mr. Schachter wants it to be read, and he had a witness who he says would have testified that a witness from the BBA who would have testified that that's not what the question meant, that the BBA would have been satisfied with any estimate, high, low, or in the middle, plucked from a range of reasonable guesses. Well, that wasn't Mr. Ewan's testimony. I think you have to look at the actual transcript, which is at docket 106.3, page 8, and if you look at what actually the appendix. I have an appendix. I don't have the transcript. Let me double-check for you. I believe I'll make my comment. Okay. Okay, we'll just read it then. Okay. What happened was, this was on cross-examination, Mr. Ewan was presented with a document that was authored by someone I believe was Fred Stern, and in it, it contained the statement that is quoted in the briefs and has been quoted to the court today where it said, this is Fred Stern saying, a contributor panelist who can borrow in reasonable market size at any one of a wide range of offered rates commits no falsehood if she bases her response to the deadline of her survey upon the lowest of these or the highest or any other arbitrary selection. That's what Fred Stern said in some document. And then Mr. Ewan was asked, do you agree? And he said, well, that's fine as far as what Fred Stern is saying. It's consistent with the definition. And then he says, but, and he goes into a whole other explanation. He says, but there's a final component of the definition, which is a bank can't submit a range. It has to submit one number. And so that's why the LIBOR question isn't where did you last borrow money. In order to arrive at that one, that one number, the question is where do you think you would be lent money, and there can only be one answer to that, and it should be where you think an unnamed counterparty would offer you money. And he said, you should be using all of the information available to you to get to that one figure. And he said, well, was that a funneling process he's asked? And he says, I don't know if it's a funneling process, but it's yes, there should be a process at the bank that lays out how you arrive at your number, and whether it's a funneling down or an iteration or whatever, however you want to describe it, but there should be a process for doing it. So he says, yes, there's a process, and it's consistent with Alan's testimony. Alan said, yes, there was a process every morning. I got down to one number. A contradictory answer, at least, if he starts by saying, yes, Mr. Stern is correct, because what Mr. Stern apparently says is that any estimate would do. And then he – initially, I agree that it's somewhat – But then he comes back and says something else. But does he ever say it would be – flatly say it would be wrong, it would be a falsehood to give an estimate that is influenced by a trader? Yes, he absolutely said that. He said that it was against the letter and the spirit of the definition to take into account a trader's interest in providing a LIBOR submission. He absolutely said that, and he said, I didn't know about it until 2012. I think he says that maybe there's some inklings in 2012, but I didn't know about it until 2010, but I didn't know about it until 2012. And, in fact, Mr. Ewan was called as a crown witness against an individual who was charged and convicted of manipulation. He was called to testify that it was not proper – it was not part of the definition to take trader interest into account. I didn't know about it, and if I had known about it, I wouldn't have approved of it. And there was a conviction in that case. So Judge Rakoff did not abuse his discretion at all in concluding that Mr. Ewan's testimony, when viewed in its totality, was not material. And, again, there's a different standard. It's not relevance. It's materiality. And in addition to materiality, there also has to be a showing that there would be – it would be a deprivation of justice if the deposition were not taken. So depositions are the exception, not the rule. And materiality is different than relevance. It has to – you know, there has to be something that would show a reasonable likelihood that would actually change the outcome of the trial or affect the outcome of the trial. In light of everything that Mr. Ewan testified to, the fact that it absolutely was not proper to take into account trader interest in setting a live wire. He didn't know about it. And that there has to be one number. Mr. Ewan's testimony would have supported our case. When you get to the one number, doesn't he get information from various sources? And isn't that what we've been calling the range of the one number, the range of the right number? Isn't that correct? The cash brokers who were still live wire submitters had their own expertise just by trading cash. And then they also collected market information. And among the market information they collected was information from brokers. And different brokers may have given different information. And so there was perhaps on any given day different numbers. And the responsibility of the live wire submitter was to take all that information and provide an estimate. And the evidence established that they were able to do it, they were able to get to that number, were able to get to an estimate, but they gave a different number. And by giving that different number, that's deceit, that's deceptive. Because it's not every estimate provided by the defendants carries with it an assertion that this is actually my estimate. This is not something else. The nature of the fraud is describe the fraud to me. What is the fraud that was perpetrated? A scheme to defraud is a scheme to deprive another of money or property through deceit. And here the defendants deceptively provided estimates that were not actually their estimates, so those were misleading and false, in order to deprive their counterparties in these interest rate swaps of their money. Because, remember, these interest rate swaps are directly tied to the LIBOR. If in this interest rate swap a counterparty agreed I'm going to pay the floating rate LIBOR on this notional amount of $10 million, if LIBOR goes up, the counterparty automatically has to pay more money to Rabobank. And so by scheming and deceptively changing that number, that… Even marginally. Even marginally. Because many of these were billions of dollars, many hundreds of millions of dollars, even marginally affects and deprives the counterparty of money or property. So that was the scheme. The whole purpose of the scheme was to profit, to maximize Rabobank's profits in these interest rate swaps. Can I turn for a moment to the 10-year statute of limitations that you need to show a harm, as we were just talking, to an FDIC bank, correct? The charge that Judge Rakoff gave, that increased risk of loss, added that the investment decisions of that bank would have been different if the bank had known of the fraud. Now, that's not anywhere in the statute. As far as I can tell, that was made up. It may be correct, but it was made up. I believe the defendant subjected strenuously to that language, and yet it was delivered to the jury. Can you speak to that? A few points. So the statute uses the word effect, and everyone agrees, the defendants agree, that an effect on a bank includes exposing that bank to loss or a risk of loss. Now, loss and risk of loss are not... Risk of loss. Right. Then he added or, so he gave an alternative ground, and there was no special verdict, so we don't know on which ground the jury decided, or that the investment decisions of that bank would have been different if the bank had known of the fraud, and that's not in the statute, is it? No, and neither is loss or risk of loss. It gives explanation for the word effect, and in our view, that is an influence on a bank's investment decision is an effect on that bank. It does affect that bank, and, in fact, there's very little difference between affecting a bank's investment decision and affecting the bank's and exposing the bank to a risk of loss because investment decisions are intended to maximize profit and reduce risk of loss. You didn't submit this language either. No, we did not submit it. We didn't rely on it in our argument at all, but a few points. Number one is this is not a jury question under this Court's precedent. It was submitted to the jury, but it didn't have to be. In the statute, the judge could have decided by himself. Well, this Court has held that in the statute that tolls the limitations period for a period of whether the defendant is a fugitive from justice, it is the district court that finds by a preponderance of the evidence whether the defendant was a fugitive and tolls that period. We don't see any way of distinguishing that determination from the determination of whether a fraud affects a bank. You needed the fraud to affect the bank to get the 10-year statute to make all these cases within the statute of limitations. Isn't that correct? For the wire fraud, for the substantive wire fraud, not for the conspiracy counts. Because an object of the conspiracy counts was bank fraud, that carried a 10-year statute of limitations already. If the convictions were based on all the overt acts of the wire fraud, it would have been harder to prove conspiracy without the overt acts. Isn't that correct? Well, a statute of limitations is an affirmative defense. It needs to be pressed by the defendants at the trial. There was never any assertion of a statute of limitations to the conspiracy counts here. So it's waived. That's the Masaccio case in the Supreme Court just recently decided. And the reason for that is because perhaps we would have presented different evidence to show whatever had to be dispensed with. They argue it now, and I suppose we would look at it as a harmless error standard. But I think they argue now that the 10-year statute shouldn't have applied. Well, for the conspiracy, it wouldn't be a plain error, harmless error. It's waived. But for the substantive wire fraud counts, the first question is whether the instructions were erroneous. We don't think they are. But if they were, the court would then determine whether it's harmless error. And in our view, it is harmless error because of the overwhelming evidence of a risk of loss to these banks, to these FDI-insured banks. These banks were the object of the fraud. They were the counterparties in these swaps, and the purpose of the fraud was to deprive those counterparties of money. So you have no problem with risk of loss? Absolutely no problem with risk of loss. In fact, I mean, it's clear, as this court has said, that if a bank is the object of the fraud, it clearly was affected. And we proved that these banks were the object of the fraud, and by being an object, were exposed to a risk of loss. You really didn't need the second phrase in that charge, which says, or that the investment decisions of that bank would have been different if the bank had known of the fraud. You really don't need that. All you need is the risk of loss. Correct, Your Honor. We don't need it. So it was surplusage, and yet there was no special verdict the jury could have found on that basis. Well, it wasn't surplusage. It was explicating the word affect. So, as this court has said, affect encompasses a broad range of influences. It's not limited to a particular loss, a risk of loss, in the language of the statute. It talks about affect. And so the court... He's just elaborating on what risk of loss. Yes, absolutely. Well, no, he's elaborating on affect. Risk of loss elaborates on affect, and changing the bank's investment decision elaborates on affect. I was only troubled that neither party asked for that language, and the defendants objected, and yet it was given to the jury. That was my concern. Well, in our view, it was consistent with the language of the statute. The jury didn't even have to make that determination because it was a determination of the judge, and any error in the instructions was harmless because there was ample evidence of risk of loss to these banks. Could I go back to the jury instructions on the theory of mail fraud for a moment? It's clear from some of my questions, I tend to agree with you that if there was not an honest answer given, that's clearly a mail fraud. But the defense actually requested an instruction that seems to me to be entirely consistent with your theory, at least what I'm inclined to think. They asked for an instruction that a statement of opinion or estimate may constitute a false statement or misrepresentation only if the government can prove beyond a reasonable doubt it was not honestly held by the person making it at the time that it was made. Isn't that an exact, accurate statement of law and indeed a statement of what your theory was, that they didn't give an honest estimate at the time that it was made? I think the only word we would quibble with is only, but yes, it was generally an accurate statement, but the court correctly concluded that that concept was already incorporated. Then where? Can you just point me to what the judge said that conveys that piece of the law? To begin with, the broader instruction where the court said that the government had to prove a plan or design to obtain money or property by means of false or fraudulent pretenses, representations, or promises, which can take the form of outright lies but can also take the consistent misleading truth. So that encompasses the general framework, and as we discussed, when someone gives an estimate that is not their actual estimate, that's a lie. So as a broad matter, that is in there. That's very specific, though, in a case where the whole point, according to the government, is that the defendants did not, at least maybe I'm misunderstanding your theory. I thought your theory was precisely that this was a fraud because the defendants did not give their honest estimate. They did not believe that this was a fraud. So that provides the background, but there's more specifics. Your reference to Judge Rakoff's instruction, do you have a page citation for it? Judge Rakoff's instruction? You seem to be reading from it. Yes, it's in the trial transcript at 1631 to 1633, I believe, or 1634, are the elements of wire fraud. So that's where that is. So again, the general instruction about falsehoods, lies, things of that sort. But then that has to be understood also together with the good faith instruction, which says a statement made with a good faith belief in its accuracy does not amount to an intentional false or misleading statement and is not a crime, even if the statement itself is accurate or misleading. So that encompasses the idea that if they felt their estimate was somehow accurate, if they believed that, they wouldn't be convicted. Now, the court also, to go further, the court also explained the government's allegations. And when he explained the government's allegations, he said, the government alleges that the defendants submitted liable or rate estimates that were not at the levels the defendants would have honestly submitted otherwise, but were instead at levels reflecting, at least in part, an intent to benefit probable banks' trading positions. So if the defendants gave under that theory, if the defendants gave their honest estimate, that's different than their, so that encompasses the idea of if they thought all three were perfectly appropriate, then they wouldn't have been guilty. Now, fourth, there's another component of the good faith instruction where the judge says if the defendant believed in good faith that he was acting properly in making such a statement or causing it to be made, even if he was mistaken in that belief and even if others were injured by his conduct, there would be no crime. So this was a very defense-friendly good faith instruction. And if they, if Mr. Conte made this pitch about a range, Mr. Allen didn't, but he made this pitch in closing arguments about, he said, look, my client thought every day there were maybe a few numbers that he thought accurately described probable banks' borrowing costs. And he didn't think there was anything wrong with providing a number based on trader interest. Now, if the jury accepted that, the jury would have acquitted under these instructions. Counsel, in an exchange with Mr. Yagami, Mr. Robson said, don't worry, mate, there's bigger crooks in the market than us. Do you have more cases that you're going to bring based on the fact that I guess everyone was a crook in doing this? These investigations and prosecutions continue. Yes, Your Honor. And now, just turning to some of the strength of the evidence of this range and the fact that they didn't believe it. Now, I mean, there's two issues here. One is sufficiency of the evidence and one is the jury instructions. I just described how the jury instructions allowed or required acquittal if the jury found the facts as described in Mr. Conte's closing statement. But the facts didn't establish that far from it. The facts established the opposite. We provided really very substantial evidence that showed that the defendants were able to, did, in fact, collect market information, come to a figure that represented their estimate, and then changed that figure and provided that figure instead of their actual estimate in order to bump up or bump down the LIBOR and benefit the traders. I think that some of the best evidence is the collection of e-mails between GSA, the government supplemental appendix 14 through 17. In that exchange, Christian Schlup from New York asks Conte, where do you see the six-month LIBOR tomorrow? And then Conte says, where do you like to see it is more the question. And then later in the exchange he says, well, at the moment, 5.40. Then later in the day, Schlup contacts Conte and says, going to need a freaking high six-month fix tomorrow if okay with you, 5.42? Conte says, remind me tomorrow. I have too much on my plate right now. So tomorrow, Schlup obliges and says, don't want you to price yourself out of the market. A 41-42 level would be great, though. Then there's another exchange between Sliney, who is another New York trader, and Mr. Allen. And Sliney asks Allen, any feel for the LIBORs today? This is the date when the other trader had asked Conte, can you bump it to 4.2? And Allen says, well, one, two, three months are 59.56, 53.5. And he says, six months, 42. I think it's six months, 42. I think that's what Christian needs, Schlup. So Christian Schlup made the request for 5.42 to Conte. Allen was aware of it. They provided 5.42 because that's what Christian needs, not because it was some reasonable number we thought it was. It was the actual number, and we changed what we actually would have given. There's another exchange with Mr. Conte, in which he similarly describes a number of 5.20. And this is at GSA 100. And he says that it was not specifically correct. He says today's LIBOR was 5.20. That was not specifically correct. It was too high. And he says, well, even though I gave 5.20 as well, just because Lee had a fixing. That's Lee Stewart, the trader who trades, who sits across the desk from Conte. So all of this evidence firmly established that there was one number that represented their estimate, and they gave a different number. Regarding the Castagar issue, there's a factual and a legal question there, both of which support and require and support the district court's determination. Legally, a Fifth Amendment claim requires both compulsion and use of the compiled statements. The compulsion and the use have to be accomplished by a sovereign bound by the Fifth Amendment. Why wasn't the use showing the testimony to Mr. Robeson? Isn't that use? Well, factually, that was not use, and that's what the district court concluded. And I can go into that. The district court, correct. That's my question. Yes. And I'll turn to that. To me, it was use if someone gets to look at it and change their testimony. That's use. Well, if the exposure to the compelled testimony is the reason for the change in the testimony, that is the use. But here we established that the changes in Robeson's testimony to the FCA in the U.K. and his trial testimony in the United States had nothing to do with his exposure to these transcripts. He plainly described, he said, yeah, I was fabricating things in the U.K. I was just trying to prevent market color because I was just trying to exculpate myself, and I was lying, right? And then he comes and he decides, now I'm going to come clean and I'm going to testify in the United States truthfully. He says the first time he was lying. Yes. Then he looked at the transcripts, and now, lo and behold, he's telling the truth. Well, looking at the transcripts did not in any way result in his actual truthful testimony. But he says. Yes, Your Honor. And it's enough for the judge, in your view, to credit what he said, and then that solves your Castigar problem? Well, we do believe that it's enough, but that's not the only component here. And we do believe that if there's credible testimony, and that's what the court in the D.C. Circuit in Point Dexter said was missing there, if you have credible testimony from a witness that his actual testimony was not influenced by exposure to tainted testimony, that can satisfy the government's Castigar burden. But we didn't only have that here. We had more. We had, number one, we looked at the overlap between the subject matter and the D.C. Circuit recently, in this Loft case, recently said, applying its own standards in the North Point Dexter cases, it said if there's no antecedent, if a person's testimony, if a person is exposed to tainted testimony, if their current testimony has no antecedent in that compelled testimony, generally that's not enough to show use. There's not going to be use there. And that was the Loft case. So if you compare... Wait a minute. So if you have a witness who gives an account before he's exposed to tainted, immunized testimony that leaves out some significant details, he's exposed to the testimony, immunized testimony that contains those details, and then he testifies at a trial, including those details, it's just a question of his credibility for the district court? Oh, I'm sorry. No. What we were saying is Mr. Allen and Mr. Conte's testimony said X, Y, Z. And Robson's testimony may have been A, B, X. But for the A and B, there's no use. The A and B is fine. Yes, and so that was one additional... But the question is the X. Yes. The question is, this is not a case where there's canned testimony that you can go back to and say, Robson essentially told the same story on every material point in the pre-exposure testimony to the post-exposure testimony. Instead, am I wrong about this, there are at least some significant issues on which either Robson testifies to something that he had never talked about before but that is in the immunized testimony or in which he actually said something different for whatever reason before seeing the immunized testimony and then changes his tune after to accord with the immunized testimony. Is that not a factual statement about at least some of Robson's testimony? Where there's overlap, the court has to determine whether the testimony from Robson was in any way affected, and that's what the court made... But that's a rather extraordinary thing to say it's just a question. A judge can just say, hey, I believe him. He has an honest face. It's fine. How is that meeting a heavy burden to establish that there is no influence of the testimony? I mean, in North... I have a passing familiarity with the North case. In North, the D.C. Circuit said, you know, even if they said the same factual thing before that they said after, the possibility that they testified more forcefully because they now knew that North wasn't going to contradict them or more emphatically because they thought that North was going to call them a liar. That is enough to change the... to be a use of the testimony. Well, I think in North, actually, there wasn't a dispute whether it was refreshing. It had refreshed the recollection, and the court held... And the issue was a legal issue whether refreshing recollection was actually use, and the court determined that it was actually use. And here, there's no... They didn't try, and they didn't show, and we proved to the contrary that there was no refreshing of recollection. There was nothing. And for a few different reasons as well. I mean, this seems to me to be really going against... This opens an enormous door for the government to make use of immunized testimony. It might be a risk, but it seems to me you're saying there's nothing that really prevents a prosecutor from giving a witness the transcript because afterwards, if he says, Oh, well, my recollection was independently refreshed by something else. Every case is going to turn on the facts. I mean, in the Slough case in the D.C. Circuit, those witnesses were exposed to testimony, and the court concluded, based on the unique facts there, that that didn't require a... That didn't kick in Kastigar. And here, we didn't just take... It's not just Robson's word. I mean, they had an ample, ample opportunity to cross-examine Robson with any kind of inconsistencies, and the court observed him. The court listened to all those arguments. The district court was in the best position to evaluate it, but we're not only relying on Robson's say-so. As I mentioned, there's also... What the court took into account as well are the testimony of other witnesses and other documentary testimony that showed... You've got one cooperator who's vulnerable to all kinds of impeachment because he's cooperating with the government in exchange for a benefit. You bring in another cooperator who's been exposed to immunized testimony, and you say, oh, there's no problem because he matches up with the first cooperator. The reason the district court took that into account is to corroborate Robson's testimony that he actually saw it, and that was the basis for his testimony because there were other witnesses there. Yeah, but he may have actually seen it, but we've got a record in which he didn't testify to it until after he had been exposed to the immunized testimony. We have Robson's testimony. We have the corroboration. We also have the fact that much of the testimony from Allen and Conte consists of kind of vague denials, a lack of recollection, and really nothing to use, nothing to provide any kind of... to prompt a memory, to change or affect, in any way affect, Robson's testimony. Cumulatively, all of that amply meant our burden under Katsigar, but we don't think we had to meet our burden under Katsigar. We only did it because we were at an abundance of caution because there was no compulsion. There was no compulsion by a sovereign bound by the Fifth Amendment. Well, if that's true, then it would have been okay, would it not, for you to introduce the transcript of Conte's testimony at this trial. You didn't do that. Under the Fifth Amendment, but we were being cautious, Your Honor. I understand you're being cautious, but you may not be cautious the next time because you're asking us to hold that it would be permissible for you to do that because since you aren't the ones who compelled the testimony in the first place, there's no bar to your use of that immunized foreign testimony at a trial. Any kind of use. The whole Katsigar hearing was a waste of time on that theory because even if Robson had been refreshed by the testimony, that wouldn't be a problem. Even if you had given him the transcript in order to refresh his recollection, that wouldn't be a problem. And even if you introduced the testimony at the trial itself, that wouldn't be a problem either. Under the Fifth Amendment, and this Court has held, that when a private employer, now, if the government, if the government has, as an employer, tells a witness, tells an employee, look, we want information. You've got to testify or we're going to fire you. If the government does that, that's compulsion under the Fifth Amendment. We can't use that at a trial. Now, if a private employer does the same and it says, well, we're going to fire you unless you provide information, that doesn't kick in the Fifth Amendment protections and that can be introduced at a later trial. And that's, the British government is on the same footing as a private employer. That's just, the Fifth Amendment has to be... Who said that? Who's... What court has supported the proposition that a British government is on the same footing as a private employer? Well, Judge Friendly ruled that a private employer like the New York Stock Exchange, if they require, say, compelled testimony, that doesn't trigger the Fifth Amendment. And what's that got to do with a foreign sovereign? Well, because if a... If the United States compels testimony, that is what triggers the Fifth... As an employer, that triggers it. And if you make that distinction between private employer and a public employer, there's no reason... The reason is because the private employer is not bound by the Fifth Amendment, just as the U.K. government is. Yes. And you earlier, in response to Judge Lynch, suggested that compulsion and use had to be by the same sovereign. That seems to be in direct conflict with our decisions in Youssef and Inouye terrorist bombings. And I was just scanning your brief in response to the Defendant's Counsel with respect to those cases, and I think it's the case that you are... You are suggesting that those passages of Youssef and Inouye terrorist bombings were dicta. Is that right? Well, they weren't necessary to the result the way we read those cases. Now, the... It's called dicta. Yes. And the reason is also because Salama is really more on all fours here. In that case, you had an individual who was in foreign custody, was allegedly compelled... It was coercive activity by that foreign entity, and then he was put into United States custody and provided statements. And this court held that because of the coercive activity was perpetrated, allegedly perpetrated by a foreign sovereign, that didn't kick in the due process protections for coercion. And now, there's a distinction between this notion of due process... Salama, with which we're all kind of familiar, it's an important case in this circuit, but it does antedate the two decisions that we were just talking about. I'm not suggesting that there was some modification of the law of the circuit, but I would think that the more recent decisions are more compelling on some of these principles. But I guess you don't agree with that. Well, I don't think that in the... I don't think that in the Yousef and the terrorist bombings case that the issue that turned on the court's decision was whether there was coercion by a foreign government that resulted in testimony used in the United States. That just wasn't an issue there as far as I read those cases. And the court did hold that the Miranda rights... I don't know why the court would have carried on about that subject. Well... It wasn't an issue. Now, the court did hold that Miranda rights, the requirement that someone be provided red warnings before their testimony can be used, is a prophylactic... That's a prophylactic rule intended to protect Fifth Amendment rights, the privilege against self-incrimination. And it doesn't kick in when foreign authorities question an individual. If a foreign authority questions... Your theory, of course, is taking us to the proposition suggested earlier     and compels the testimony since it's a different sovereign and it's a different country and it's a different country and it's a different country and it's a different state and then you're able to use use that compelled testimony in a federal court. Well there might be other constitutional doctrines that kick in there. We acknowledge that. It's not a Fifth Amendment... It's not a Fifth Amendment issue, no. No it's not a Fifth Amendment issue. There could be something... They don't beat somebody but they simply compel him by force of legal compulsion that's legal in that country to do. In that event I assume that wouldn't shock anybody's conscience to follow that. So it's not necessarily a due process question. You're saying as a matter of Fifth Amendment law anyway that's perfectly for you. You are overly cautious here because you absolutely could have introduced Allen's and Conte's testimony on your theory. Correct, Your Honor. And we added an abundance of caution we didn't and we also showed factually that we did not use it. And the district court's determinations are not clear in light of the record. The really meticulous evaluation is clear. Our standard of review of that decision is clear. Yes, Your Honor. Clear. All right. Anything else you'd like to add? Unless the Court has any questions we're happy. We would ask that the Court affirm. Thank you, Your Honor. I would like to begin with something that the government says here and said in the indictment but did not say to the jury. The government here said that they the evidence showed that their estimates were not their estimates. They also said that they came up with one number and gave a different number. That would fall within what is established law with respect to fraud based on statements of opinions or estimates. They have to prove beyond a reasonable doubt that it was not honestly held by the person making it at the time. It was disbelieved by the speaker. That is the theory that the government articulated in the indictment. Isn't it a reasonable inference from the kinds of conversation that Mr. Feliciari read to us that if if Schlute says to Conte you know what do you think the number is going to be and Conte says the real question is what do you want it to be? How can why couldn't a reasonable jury draw the inference beyond a reasonable doubt that Conte wasn't interested in making an honest estimate. He was interested in doing whatever Schlute wanted or at least whatever Schlute wanted that wasn't so ridiculous that they'd be laughed at and people would start to suspect there was something wrong. Why is that not a plausible inference? There is no question that swap traders made requests. They would say hey can you put it higher or lower and there is no question that the cash traders would say sure. That does not prove a violation of the wire fraud statute because the government has an obligation to prove that the ultimate statement that the speaker made was disbelieved by him at the time. That can be a matter of inference. We're always trying to draw inferences about what's in somebody's head and it seems to me if somebody says to another person what I'm interested in is just what do you want? That's all I want to know. That's what I care about. And then he gives the estimate that Schlute asked for and there's no other evidence suggesting that there was some calculation that reached that number. Why can't it and it's a matter of inference whether the Mr. Conte in this case didn't believe what he said. Here it would be based entirely on speculation because that's not what the government told the jury they needed to determine. They didn't tell the jury both Judge Rakoff again that was a theory articulated in the indictment. It said that they submitted rates that were inconsistent with what they perceived to be the rate. Comes time for the charge conference and Judge Rakoff says that the court's going to describe the charges in this other way. That doesn't speak to it being inconsistent with the opinion that the speaker actually had. And instead comes up with the formulation that they submitted a LIBOR rate that was different than they otherwise would have to help their employer. Different however does not equal false. And we said Your Honor if you're going to describe the indictment why not use the language of the indictment and we asked the court to include just that language. That might have been better for the judge to do but still he does give the good faith instruction. But if the person believed in good faith that what he was doing was submitting the right estimate he's fine. The problem with the good faith instruction there's a number of problems with the good faith instruction. Principally the good faith instruction tells a jury here's the circumstances where a statement may not amount to a false or misleading statement. The problem was it was academic to the determination that the jury was told by the court and by the prosecutors in summation that they needed to make because they didn't need to consider whether a statement was false. Then the good faith instruction would have been a useful tool for them. But that's not what they were asked to determine. Judge Rakoff said that the crime the issue that you need to determine jury is was it different? Was it influenced in part by what would help their employer? The prosecutor and these words are really important. The prosecutors in summation said if you find that the defendants took part in the scheme to base Rabobank's LIBOR submissions at least in part on trading positions you convict. Regardless of whether they're inside or outside of the range you should convict. So in other words the jury Stay away from the range please. Whether or not it's what they honestly believed. Yes. Yes. Whether or not it's what they exactly. That's the problem. In other words whether or not they honestly believed are not there. It seems to me that what Mr. Ewen's testimony at least as the part that Mr. Pelletieri quotes says he would have thought that that was not what they're supposed to do. They're supposed to give their honest estimate not what the what they wish it would be for their own trading positions. I'm going to answer that question two ways. First perhaps one could say that's unethical. That is a sharp practice. Wire fraud does not embrace everything that one wishes to consider to be a sharp practice. I said two ways. There's two ways. That is that it was not clear even to the government's own cooperating witnesses that there was anything inappropriate with as long as you're submitting a rate that is within the range. It's a fair and reasonable thing to do. The government's cooperating testimony at trial testifies      he had no inkling that there was anything inappropriate for swap traders to ask the people submitting LIBOR for a higher   the government's own testimony that LIBOR submissions at Rabobank were an issue or a problem. That's the government's own cooperating witness who ultimately pled guilty pursuant to a cooperation agreement. The other cooperating witness says the same thing. Mr. Yagami testified the practice of adjusting submissions by a few basis points based on a trader's request was a gray area but quote agreeable and quote okay to do. He even testified about a conversation that he had with Mr. Robson a contemporaneous conversation before he was threatened with indictment and ultimately pleads guilty. Mr. Yagami testified the same page of the appendix that Mr. Robson said that it was okay because LIBOR moves in a range and there were multiple    Robson testified that there was only one rate that was correct. That's what he just said on the podium. Absolutely there is nothing that supports that. I think what council from the government said is there was only one rate that can be submitted. Ultimately you may be contradicted by the evidence of trial. There is nothing in the record which suggests that there was one rate. I suppose in part because there are 15 plus banks which are making their own estimates of what the correct rate is. And there is no interbank borrowing during most of the time period. Certainly for most of the time period they have to pay to borrow for eight months. There can't be one number. It never happens. It's at best a rough estimate. It's between 3.1 and 3.2. I can put it in anywhere. In fact when the government points to the number 5.20 which Mr. Conaty puts in LIBOR that day at 5.20 that's final LIBOR that day. Final LIBOR is 5.20. Which means the final LIBOR is you have 16 panel banks that each submit their estimate. And the BBA lops off the top four, lops off the bottom four, averages the middle eight. And Mr. Conaty's submission that day 5.20 was exactly the same as the average of the middle eight banks. That can't be fraud. Mr. Conaty thought it was 5.18 and if you put that in it might have come out as 5.19 as the total average. I agree with your honor. 100%. And had the jury been instructed as we asked on how they should assess an opinion or estimate and they have to find that the opinion or estimate was disbelieved by the speaker, had judge told them that's the test, maybe it wouldn't be an issue, but that's not, and the reason why the court and the government instructed the jury in this fashion was because it was the end of the trial and the government had not presented any evidence that any of the opinions were in  the opinion of the speaker. And that's why they opted for this different formulation which is not consistent with wire fraud. I have a final question before we recess. There was a reference earlier about a deferred prosecution of Robobank. Did you represent them? No. And it's of no relevance. Look, the reality is... It antedated the indictments here. Absolutely correct. And financial institutions settle cases with the government for all sorts of reasons. I understand that. What was the role of any of Robobank in cooperating with the government? Do we know that? Do we care about that? I don't think it is of any moment. I think they responded to the government's request. I think Mr. Robobank was helpful to the court if counsel on both sides were to make arrangements with the clerk's office to have a transcript of this splendid oral argument prepared for your use as well as ours. Thank you very much. We'll take this case under submission. You'll expect a summary order, I know. But after the summary order we'll recess. We will adjourn for the day.